**UNITED STATES of America, Appellee,**

v.

**Jimmie L. WILSON, Appellant.**

No. 87–2280.

United States Court of Appeals, Eighth Circuit.

Submitted May 11, 1988.
Decided Aug. 5, 1988.

issue pending in this case.

Darrell F. Brown, Little Rock, Ark., for appellant.

Sandra Cherry, Asst. U.S. Atty., Little Rock, Ark., for appellee.

Before MAGILL, Circuit Judge, BRIGHT, Senior Circuit Judge, and NICHOL,* Senior District Judge.

BRIGHT, Senior Circuit Judge.

Jimmie L. Wilson, who is a black male, appeals the district court's determination that the Government did not violate the dictates of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) when the Government used all six of its peremptory challenges to strike six black people from the jury panel in the criminal case brought against Wilson. Wilson contends the district court applied an incorrect presumption to the Government's explanations for the strikes and an incorrect standard of proof in determining the neutrality of the Government's explanation. In our view, the Government did not rebut Wilson's strong prima facie case of the Government's racial bias in using all of its peremptory strikes solely against blacks on the jury panel.

## I. BACKGROUND

Jimmie L. Wilson worked as a farmer and lawyer in the Lexa/Helena area of eastern Arkansas. On October 16, 1984, a grand jury indicted Wilson for defrauding the United States government by knowingly disposing of property mortgaged to a

---

* The HONORABLE FRED J. NICHOL, Senior United States District Judge for the District of South Dakota, sitting by designation.

government agency.[1] On March 26, 1985, a jury in the United States District Court for the Eastern District of Arkansas found Wilson guilty. Wilson appealed to this court raising, among other issues, the Government's use of its six peremptory challenges to strike six blacks from the jury panel. This court affirmed the conviction in all respects. *See United States v. Wilson*, 806 F.2d 171 (8th Cir.1986). This court noted that, at the time of decision, the Supreme Court's recent decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), did not apply to Wilson's case, and that he failed to establish a case of discrimination under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, *reh'g denied*, 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965), the prevailing law at the time.

Subsequent to this court's affirmance of Wilson's conviction, the Supreme Court decided *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), holding that *Batson* applies to cases which had not become final on direct appeal prior to the issuance of *Batson*. Because Wilson's appeal fell within this category, this court vacated its prior affirmance and remanded the case to the district court for a *Batson* hearing. *United States v. Wilson*, 815 F.2d 52 (8th Cir.1987).

On July 13 and 30, 1987, the district court held the *Batson* hearing. At the hearing, the Government stated that Wilson was a well-known civil rights activist in the Lexa/Helena area and that great racial strife still exists in eastern Arkansas. Because of Wilson's notoriety, the small town nature of the area, as well as the racial strife, the Government justified its peremptory strikes of blacks as persons who knew or might have known Wilson, as persons who were farmers (more specifically, people who had FmHA loans) and as persons who had family or relatives who had been charged or convicted of crimes.

The transcript of the voir dire indicates that the district judge began questioning the panel as a whole. These questions addressed whether anyone on the panel knew Wilson, whether any panel members or their close family had a criminal background, and whether any of them were farmers. The trial judge then permitted the Government and defense to ask questions.

The Government proceeded first. The Government asked two unidentified panel members who lived in Lexa if they had ever seen Wilson, to which they both responded in the negative. The Government then asked whether any of the prospective jurors or their relatives had ever been represented by Wilson or his legal associates. The record indicates no response. Finally, the Government asked whether any of the panel members had a brother, parent or sister who had been a defendant in a criminal case. A Mr. Parker (a white male) stated he had a brother who had been a criminal defendant, but upon the court's question, indicated this fact would not prevent him from being fair to both sides.

It is undisputed that the Government used all six of its peremptory challenges to exclude six blacks and no whites from the panel.[2] Based on these six challenges, the district court concluded that Wilson established a strong prima facie case of race discrimination under *Batson*. The Government prosecutors who tried the case then testified to the reasons for striking only

---

1. Specifically, the grand jury charged, and a jury so found, Wilson "guilty of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, of forty counts of knowingly disposing of property mortgaged to a government agency [FmHA] in violation of 18 U.S.C. § 658, and of seven counts of unlawfully converting to his own use money of the United States, in violation of 18 U.S.C. § 641." *United States v. Wilson*, 806 F.2d 171, 172 (8th Cir. 1986).

2. Wilson established at the *Batson* hearing that originally, the venire consisted of eighty-eight people, thirty-four blacks and fifty-four whites, representing percentages of 38% and 62%, respectively. The panel brought into the courtroom consisted of seven blacks and twenty-six whites, representing 21% and 79%, respectively. The ultimate jury consisted of one black and eleven whites on the main panel, and one alternate who was white, representing 7% and 93%, respectively.

blacks.[3] The Government attorneys destroyed all of the documents and information they had used during the voir dire. Thus, they based much of their testimony on a copy of the jury panel list with short handwritten notations next to the names of the six blacks, indicating why the Government struck the blacks. According to a statement made at oral argument, the Government attorneys made these notations many months after the jury selection, in preparation for Wilson's original appeal. The Government attorneys could not remember anything about the white members who remained on the jury panel. The district court found the Government's explanation sufficient under *Batson* and thus rejected Wilson's challenge to the conviction. This appeal followed.

## II. DISCUSSION

### A. Presumption

■ Just before the district judge rendered his decision on the *Batson* issue, he noted that, while Wilson did have a strong prima facie case, "[t]he Government is not and should not be treated as a private party. Both the people of this nation and the courts have to rely upon the good faith of the Government attorneys when they make and exercise the Government's peremptory challenges in a case of this type." Hearing Tr. at 278–79. This language implies that the Government is entitled to a presumption that it exercised its peremptory challenges in a constitutional manner. However, under *Batson*, the Government is entitled to no such presumption.

The district court's statement appears to be based on *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, *reh'g denied*, 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965). In *Swain*, the Court held that a defendant may succeed in his or her equal protection challenge to the discriminatory use of peremptory challenges, only if the defendant establishes that the prosecutor systematically excluded blacks from petit juries over a period of time. 380 U.S. at 223–24, 85 S.Ct. at 837–38.

In *Batson*, however, the Court held "that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722. In referring to the *Swain* burden of establishing systematic exclusion, the Court in *Batson* stated, *"Swain* has placed on defendants a crippling burden of proof, prosecutors' peremptory challenges are now largely immune from constitutional scrutiny." *Id.* at 92–93, 106 S.Ct. at 1720–21 (footnote omitted). Again, the Court stated that "[f]or evidentiary requirements to dictate that 'several must suffer discrimination' before one could object, would be inconsistent with the promise of equal protection to all." 476 U.S. at 95–96, 106 S.Ct. at 1722–23 (quoting *McCray v. New York*, 461 U.S. 961 at 965, 103 S.Ct. 2438 at 2440–41, 77 L.Ed.2d 1322 (1983) (Marshall, J., dissenting from denial of certiorari (footnote omitted)).

■ It is evident the *Swain* requirement that the defendant must prove systematic discrimination evolved from the presumption that the Government used its peremptory challenges to obtain a fair and impartial jury in that defendant's case. *See Swain*, 380 U.S. at 222, 85 S.Ct. at 837. It is also evident that under *Batson*, there is no need to prove systematic discrimination. Thus, the need for, or even the existence of, the presumption under *Batson* is absent. The district court utilized an improper presumption in ruling that the prosecution's explanations overcame the strong prima facie case of racial bias.[4]

---

3. We note that the same two prosecutors represented the Government at Wilson's trial, the first appeal, a portion of the *Batson* hearing and the present appeal. Because the propriety of the actions of these prosecutors were in issue, we think it might have been better practice for an uninvolved United States Attorney to present and argue the appeal.

4. The district court erred by applying the above presumption to the Government's explanation and by applying an incorrect standard of proof to the Government's explanations. Applying incorrect evidentiary standards requires that we reverse the district court.

### B. Standard of Proof

Under *Batson,* once the defendant establishes a prima facie case of race discrimination, the government "has the burden of articulating a clear and reasonably specific neutral explanation for removing a venire person of the same race as the defendant." *United States v. Cloyd,* 819 F.2d 836, 837 (8th Cir.1987).

■ What constitutes a neutral explanation is a question of comparability. Essentially, one must compare the characteristics of the individual which prompted the Government's strike with the characteristics of those not struck by the Government. In order to have a neutral explanation, the characteristics of the struck individual cannot be present in those white panel members not struck by the Government. For example, if the Government strikes one prospective black juror because of the cut of his or her clothing, this peremptory challenge will be suspect if the Government allows white panel members with a similar cut of cloth to remain on the panel. Other circuits have adopted this concept of neutrality. *See, e.g., United States v. Thompson,* 827 F.2d 1254, 1260–61 (9th Cir.1987); *see also Roman v. Abrams,* 822 F.2d 214, 228 (2d Cir.1987) (comparability under a sixth amendment analysis); *Garrett v. Morris,* 815 F.2d 509, 514 (8th Cir.) (comparability under application of *Swain* principles), *cert. denied,* —— U.S. ——, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987).

In this case, the Government entered voir dire seeking to strike prospective jurors who had one or more of the following characteristics: those who knew Wilson or his colleagues, those who were farmers (specifically those with FmHA loans) and those who had close family members with criminal backgrounds. We have closely examined the Government's concerns and the reasons proffered by the prosecutors for striking the six black panel members and compared them with the records of the jury selection at the trial and at the *Batson* post-trial hearing. We conclude that the Government failed to demonstrate that neutrality exists between the six blacks struck and those whites who were not struck.

The Government struck Charlie Brooks, a black man, who lived in Lexa. However, the Government did not strike Agnes Ginn who is white and also lived in Lexa. The Government explained that it struck Brooks because of a fear that Wilson's friends would pressure Brooks into favoring the defense, while Wilson's friends would not apply such pressure to Ginn. According to the prosecutors' testimony, the basis for such a conclusion was that Wilson's friends, presumably all black, would contact a black juror but not a white juror. Cut to the heart of this matter, the Government struck Brooks because he is black, and did not strike Ginn because she is white.

During voir dire, the Government asked the panel whether anyone had a parent, brother or sister who had been a defendant in a criminal case. Paul Parker, a white man, responded that his brother had been a defendant. He assured the court, however, that he could give both sides a fair shake. The Government did not seek an explanation from Parker as to the nature of the charge, nor whether the charge led to a conviction. On the other hand, Leola Cline, a black woman, had a brother and an uncle who were convicted criminal defendants. Ms. Cline did not proffer this information in response to the Government's question; rather, the Government allegedly obtained this information through its investigation of Ms. Cline. The Government did not ask, nor request the court to ask, Ms. Cline whether she too could be a fair and impartial juror. The Government simply took the opportunity to preclude another black from hearing Wilson's case.

The Government also struck Paul Harris, a black man, because of his outlandish clothing worn the day of voir dire. However, at the *Batson* hearing, the Government failed to present evidence or explanation as to the clothing of any of the white panel members. Without such an explanation, it is impossible to even begin an examination of whether this reason is neutral and comparable. The Government's expla-

nations for the three other blacks struck suffer from the same infirmity.

█ The Government struck James Byars because it had information that Byars was a friend of Wilson's colleague, Ollie Neal, even though Byars did not so respond in voir dire. The Government failed to verify Byars' relationship with Neal, nor did the Government provide information indicating whether the whites investigated, if any, were or were not friends of Wilson or Neal. In addition, the Government's explanation exhibits the same racism pervading the Government's explanation for striking Brooks. The idea that, because Byars is black and lives in the area, he obviously knew Wilson and would, because of race, sympathize with his position envisions a segregated society where an individual's associations are dictated solely by race. We will not accept these racist assumptions and stereotypical reasoning in justifying the Government's jury selection.

█ Fate Gray indicated that he had seen Wilson in town. Upon questioning by the court, Gray stated that he was not on a speaking acquaintanceship with Wilson, that Wilson had never represented Gray, and that Wilson would in all likelihood fail to recognize Gray. The Government claims that it struck Gray because it had outside information that Gray was a friend of Wilson's and Neal's and had participated in a boycott Neal sponsored. However, the Government's explanation is without even minimal verification, and without more, is an insufficient neutral explanation.[5] The Government failed to provide any information whether the white panel members were or were not participants in the boycott.

The Government's justification for striking Gray, as in the case of other black panel members, rests on an "after the fact" excuse. The Government, many months after the trial and pending the original appeal to this court, recreated a list of reasons for the strikes for the benefit of the appellate panel even though no record existed to support such an argument.

Curiously, although the issue of racism in peremptory strikes surfaced during and immediately after the March 26, 1985 trial, the prosecutors presented no actual records of any investigation of the panel which would have supported the Government's strikes. The failure to produce such records seems unusual. The net effect of a failure to recite reasons differentiating the blacks who were struck from others on the jury list represents a failure by the Government to establish a neutral reason for its strikes. The prosecutors simply have failed to show that the stricken blacks' alleged inadequacies for jury duty were any different from the whites' remaining on the jury panel.

Finally, the Government struck Denise Campbell. Ms. Campbell did not respond to the voir dire question whether she had any relatives who were criminal defendants. The Government struck her because it allegedly had received information that her husband was a criminal defendant. Again, the Government did not verify the husband's conviction at the *Batson* hearing. This comes as no surprise since the Government's information was incorrect; Campbell's husband never had been a criminal defendant. As in Leola Cline's case, the Government failed to determine whether Campbell could be a fair and impartial juror. However, Campbell is black and, thus, the Government assumed she could not assess its case fairly.

█ Race is the common characteristic shared by each of the panel members struck by the Government. The reasons for the strikes either apply to both the blacks struck and the whites not struck, or cannot even be examined to determine comparability. In our reading of the record, we are left with the distinct feeling that the Government's explanations for using all six of its peremptory challenges to strike black panel members rested on race. No matter that the prosecutors may have honestly believed that Wilson's prosecution was at greater risk with blacks, rather

---

**5.** The Government's asserted grounds for striking Fate Gray appear especially weak where the record reveals that the prosecutors recollected Gray as a black female when in fact the evidence at the *Batson* hearing revealed him to be male.

than whites on the jury; this honest belief cannot suffice under *Batson*. This belief, unless supported by neutral reasons for striking blacks, will not overcome the prima facie showing of racial bias in jury selection. Additionally, the charge of racial bias receives some support from statements by the prosecutors evincing racial considerations in the selection process [6] and objective evidence that blacks, while possessing similar characteristics as whites, were the only persons the Government struck.

## III. SUMMARY AND CONCLUSION

In this case, the district court followed no specific formula in weighing the evidence for a determination whether plaintiff sustained his burden of proof in establishing racial bias by the prosecutors in the jury selection.

In *United States v. George Wilson*, 816 F.2d 421 (8th Cir.1987), we specifically set forth general guidelines for a hearing on a retroactive *Batson* claim. We said:

*Batson* substantially redefined the evidentiary burden placed on criminal defendants claiming an equal protection violation due to the prosecution's use of peremptory challenges. Under *Batson*, a defendant 'may establish a prima facie case of purposeful discrimination in the selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the de-

fendant's trial.' *Id.* at 422 (quoting *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23).

In remanding the *George Wilson* case, we further stated:

On remand, the district court is to determine whether a prima facie case of purposeful discrimination has been established by the prosecutor's use of peremptory challenges during voir dire to strike prospective black jurors. If so found, the district court is to require the prosecutor to provide a 'neutral explanation' for the peremptory strikes. The defendant must then be given the chance to rebut the proffered explanation as a pretext.

*George Wilson*, 816 F.2d at 423.

Although we filed the *George Wilson* case on April 16, 1987, three months before the *Batson* hearing in the present case, neither the district court nor the parties proceeded specifically in the precise manner which we had specified. Yet, the record as a whole established here that the plaintiff carried his burden to establish racial bias in the use of peremptory challenges. First, Jimmie L. Wilson established a prima facie case, as we have discussed. Second, the prosecutors did not provide a neutral explanation for those strikes. Finally, to the extent that one might consider the prosecutors' contentions as neutral explanations, the record as a

---

**6.** While we do not give it independent weight because it is open to different interpretations, we note that race did enter the prosecutor's mind when striking the black panel members, as evidenced by the prosecutor's response to questions by Wilson's counsel:

Q Do you recall saying at the Eighth Circuit [in the first appeal of this case], quote, I can only say and represent to the Court that being the one responsible for that, I had to deal with what would be fair also to my client, and really for the first time in my history I did this feeling that that was my obligation to do.?

A That sounds close to exactly what I said.

Q What did you consider to be fair to your client?

A I believe what I meant when I said that to Judge Arnold was that I was at that time telling Judge Arnold, but I don't have the transcript and you may, that I was prepared

at the District Court level and was prepared then at the Eighth Circuit level to explain, as the court now terms it, neutral reasons, or reasons that I felt it was necessary to strike a black juror when I had not ever been in that situation before to have to strike blacks from a panel ostensibly as we did here.

\*   \*   \*   \*   \*   \*

Q Actually, it was the first time in your history you had ever consciously excluded blacks from the jury; isn't that correct? The first time in your history, the first time you had that experience?

A Yes. Let me say that it was the first time that I had ever been responsible for striking blacks from a panel with a black defendant and so forth that I can remember. I've tried a lot of cases and I can't be absolutely certain, but I think it was one of the few or only times I can remember.

Hearing Tr. at 38, 39.

whole disclosed those explanations to be pretextual. Accordingly, in this case to resort to the standards of proof enunciated in the *George Wilson* case requires a reversal of the district court.

Lastly, we would note the restricted application of the precedent in the case under consideration. In light of our frequent admonitions to district courts to require prosecutors to provide fair reasons for peremptively striking black jurors, *see George Wilson*, 816 F.2d at 424–26 (8th Cir.1987) (Bright, J., concurring separately), we think it unlikely that very many cases raising the *Batson* issue retroactively will contain as little contemporaneous material bearing on peremptory strikes as the present case. Moreover, in other cases arising subsequent to *Batson* and raising the same racial bias issue, the parties will have presented a record of their views and reasons relating to the prosecutors' peremptive strikes of black jurors, and the district court will have ruled on the objections in light of the *Batson* decision. Thus, on review, a different sort of record should be before this court.

Thus, in sum, for reasons stated in this opinion, we reverse the district court and remand so Jimmie L. Wilson may have a new trial.